CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 0 1 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 5:10cr00026 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| RALPH LEON JACKSON | ) | By: Samuel G. Wilson |
| | ) | United States District Judge |

     Ralph Leon Jackson pled guilty to capital murder and three other related offenses in exchange for a life sentence. Jackson received the benefit of his bargain but has now filed a motion pursuant to 28 U.S.C. § 2255 maintaining he received ineffective assistance in two respects. First, he claims that counsel misadvised him concerning the viability of an intoxication defense capable of reducing the homicide from murder to manslaughter. He contends that he was intoxicated to such an extent that "a verdict of manslaughter would have been probable." (Br. in Supp. of Mot. to Vacate 20, ECF No. 55.) He claims that had counsel properly advised him concerning the matter, he would have insisted on going to trial rather than pleading guilty. Second, he claims that one of two statutorily required court-appointed attorneys rendered little or no assistance. Both claims are frivolous. Jackson's voluntary intoxication would not have been admissible to reduce the homicide from murder to manslaughter and Jackson's Sixth Amendment rights turn on the issue of whether Jackson received effective assistance of counsel not the role played by one or the other of his two court-appointed lawyers. Accordingly, the court *sua sponte* denies Jackson's motion.

I.

     On November 10, 2010, a federal grand jury returned a five count superseding indictment against Jackson arising out of an episode on the Blue Ridge Parkway within the Western District

of Virginia during which Jackson shot and killed 27-year-old Timothy Phillip Davis and seriously wounded Davis' 18-year-old friend, Christina Shay Floyd.  Count One charged Jackson with assaulting Floyd with intent to commit murder on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7(3) and 113(a)(1); Count Two charged Jackson with assaulting Floyd with a dangerous weapon with intent to do bodily harm on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7 (3) and 113(a)(3); Count Three charged Jackson with knowingly using, carrying, and discharging a firearm, a 20 gauge shotgun, during and in relation to the crimes of violence alleged in Counts One and Two; Count Four charged Jackson with willfully, deliberately, maliciously, and with premeditation and malice aforethought killing Davis on land that is within the United States' concurrent jurisdiction in violation of 18 U.S.C. §§ 7(3) and 1111(a); and Count Five charged Jackson with using a firearm during and in relation to the murder alleged in Count Four in violation of 18 U.S.C. §§ 924(c)(1) and 924(j).  Counts Four and Five carried possible death sentences.  Accordingly, the court appointed two attorneys to represent Jackson as required in federal capital cases by 18 U.S.C. § 3005.[1]

Jackson's counsel had Jackson examined by psychiatrist, Dr. Bruce J. Cohen, an associate professor of psychiatry at the Department of Psychiatry and Neurobehavioral Sciences at the University of Virginia Health System.  Dr. Cohen reported that although he "[did] not find evidence of an underlying psychiatric illness such as depression, bipolar disorder, or schizophrenia, or a medical illness leading to changes in mental status, [Jackson did] appear to

---

[1] The United States first charged Jackson with a capital crime in a superseding indictment returned on November 10, 2010, the court arraigned Jackson on Nov 15, 2010, and the court appointed an additional attorney on November 30, 2010.

have been impaired at the time of the offense, likely due to a combination of intoxication and emotional distress." (Br. in Supp. of Mot. to Vacate, Ex. A, at 7, Docket No. 55-1.)

While the United States was considering whether to seek a death sentence, Jackson agreed to plead guilty in exchange for a life sentence. Jackson's written plea agreement, which the parties signed on March 23, 2011, called for Jackson to plead guilty to Counts One, Three, Four, and Five. Jackson was to receive a life sentence on Count Four (which carries a mandatory life sentence) and additional sentences of incarceration on the remaining counts. Jackson also agreed to the following joint stipulation of facts in support of his plea:

> The offenses described below occurred within the Western District of Virginia. This Statement of Facts briefly summarizes the facts and does not contain all of the information obtained during this investigation.
>
> On April 5, 2010, Christina Shay Floyd ("Floyd"), an 18 year-old high school senior, made plans to meet Timothy Phillip Davis ("Davis"). Davis and Floyd had been friends for approximately four years, having met at WNRN Radio station in Charlottesville. Davis, who was 27, had been Floyd's mentor at the radio station when she had volunteered there two or three years prior. The two were not romantically involved.
>
> At approximately 3:00 p.m. on April 5th, the two met at the Fashion Square Shopping Mall in Charlottesville, Virginia. They decided to take Floyd's car and drive to the Blue Ridge Parkway and "just hang out." Once on the Parkway, they drove around for a couple of hours taking in the views and talking. Realizing they were low on gas, they left the Parkway at Waynesboro, Virginia and refueled.
>
> After filling the tank, they returned to the Parkway to look for a good place to park and view the sunset. They ultimately stopped at the Rock Point Overlook which is located at Mile Marker 10. The overlook is essentially a "pull off" from the main road that has a wooden guardrail/bench separating the parking lot from a very steep drop off. The pull-off is large enough to accommodate five to six cars. When they first arrived at the overlook, there was another car already there, but that vehicle pulled away shortly after their arrival. Floyd parked her car parallel to the main road and wooden guardrail. This location on the Blue Ridge Parkway is within the special maritime and territorial jurisdiction of the United States.
>
> Floyd and Davis exited the vehicle and took a seat on the wooden guard rail overlooking the National Forest. Davis was sitting straight forward while Floyd was turned slightly facing Davis. After about 45 minutes a small red "Taurus looking" vehicle pulled into the overlook - facing the opposite direction as the Floyd vehicle - and about two vehicle distances away from where they sat.

Floyd and Davis thought this odd because there was only one person in the vehicle and the driver did not initially get out. Assuming the driver was just waiting for someone, Floyd and Davis paid no further attention to the vehicle. Approximately 15 minutes later Floyd heard a loud ringing and noticed that Davis had thrown up his hands, was groaning, and had blood all over his face. Floyd looked back at the red car and noticed a long gun being pointed at them from the driver side of the vehicle. A person, later identified as Ralph Leon JACKSON ("JACKSON") exited the driver side of the car and walked toward them with a gun in his hand. By this time, Davis had fallen onto the ground - on the forest side of the guardrail/bench. JACKSON then shot a second time at Floyd, and she felt a stinging sensation. Both Floyd and JACKSON ended up on the side of the railing away from the Parkway (i.e. the forest side), at which time JACKSON set the gun down. In an effort to protect herself and to escape, Floyd physically engaged and struggled with JACKSON. During the struggle, Floyd asked, "Why are you doing this?" To which JACKSON responded "because I'm crazy." The initial struggle ended when Floyd fell off the ledge to a second ledge approximately six feet below. Floyd was able to run up the ledge back to the parking area - further north from where she and JACKSON had initially struggled. Floyd was then at the beginning of the parking area near the Parkway sign indicating the entrance to the overlook. It is significant to note that during her efforts to escape and to protect herself, Floyd lost the flip-flops she was wearing and she had ripped the shirt that JACKSON was wearing.

As Floyd attempted to climb the ledge trail back to the parking lot, JACKSON approached Floyd again and a second physical struggle ensued. JACKSON went back up the hill (still on the forest side of the guard rail and about five feet above Floyd) and threw approximately eight rocks, each the size of a large cucumber, at Floyd. Several of the rocks hit Floyd, ultimately causing two skull fractures and a broken finger. JACKSON eventually stopped throwing rocks and walked toward the gun he had previously dropped. When he did so, Floyd took the opportunity to get up the hill and ran, barefoot, down the Parkway in hopes of getting to safety. A short distance down the road Floyd encountered a truck driven by Richard McDaniel. His wife, Georgia McDaniel, was a passenger in the truck. Ms. McDaniel rolled down her window and asked what was going on. Seeing that Floyd was drenched in blood and seeing JACKSON now pointing the gun at the truck, Ms. McDaniel pulled Floyd into the truck and they drove away from the scene. There are some discrepancies between the witnesses as to whether JACKSON shot at the truck and, if so, how many times. No damage was ultimately found on the truck, but witness testimony suggests that JACKSON shot at least once as the McDaniels drove away.

With Floyd in his truck, Richard McDaniel turned his vehicle around and drove back down the Parkway where he encountered a rescue squad vehicle and turned Floyd over to them for medical attention. A medical examination revealed that Floyd sustained a collapsed lung as a result of shotgun pellets, two skull fractures, gashes to the head for which she received ten staples, and a broken finger. She also has approximately eight pellets still embedded in her back.

Floyd never saw Davis after JACKSON first began to shoot. It is significant that when Floyd last saw Davis, he was lying on the ledge at the same level as the Parkway. When the rescue squad arrived on the scene of the shootings shortly after Floyd was rescued by the McDaniels' they discovered Davis some *200/300* feet below the level of the Parkway. It is unknown how Davis ended up at the bottom of the cliff. JACKSON allegedly told a family member that Floyd pushed or threw Davis off the cliff.

After significant efforts by rescue personnel, Davis was brought up from the bottom of the cliff and was airlifted to the University of Virginia hospital for medical treatment. He was unresponsive and intubated at the time of arrival. On April 10, 2010, Davis died from injuries inflicted directly or indirectly by JACKSON. Specifically, the Office of the Chief Medical Examiner, in a Report of Autopsy ("ROA") dated September 14, 2010, determined that the manner of death was "homicide" with the cause of death as "perforating shotgun wound to the head." The ROA further indicated that "blunt force injuries to head and neck" contributed to Davis' death. Specifically, the ROA reported:

.... multiple small perforations from what was likely **at least two** (2) **shotgun** blasts. (Emphasis added). One involved the front of the face and head with perforations of the base of the skull and brain. The brain had severe injury including pulpification, hemorrhage and contusion. The brain had associated cerebral edema and subarachnoid hemorrhage.

There were no gross or microscopic findings that could be distinctively separated and attributed solely to blunt force injuries to the brain from the fall down the cliff. The severe brain injury findings are predominately from the shotgun injury but may also include blunt force injury from the fall.

The second shotgun blast involved the right side of the face and the right shoulder and upper extremity.

Blunt force injuries included abrasions and contusions to the torso and extremities.

There were no suspects in this case until April 7, 2010, when Crimestoppers received a call on their "tip" line. Agents met with the Crimestopper's caller and based upon the information provided and the description of the assailant provided by Floyd, an arrest warrant was obtained for JACKSON.

On April 7, 2010, JACKSON was detained at his residence and read his rights under Miranda. JACKSON waived his rights and agreed to voluntarily go to the Augusta Co. Sheriff's Office to be interviewed. Prior to departure, the agents seized a Harrington & Richardson, Pardner, 20 gauge, single shot, shotgun, serial number CAC057974, as well as several rounds of yellow 20 gauge ammunition from a gun cabinet. During the course of the interview, JACKSON admitted, among other things, the following:

(1) that he had purchased the Harrington & Richardson, Pardner, 20 gauge, single shot, shotgun approximately a week prior to the shooting for the purpose of turkey hunting; (2) that on the night in

question he had borrowed his daughter's car to travel to a local grocery store located not far from his home; (3) that he "shot that son of a bitch because he was my son-in-law and I thought he was fucking with my daughter" (claiming to have mistaken victim Tim Davis for his son-in-law); (4) that he saw a vehicle at the overlook and two people sitting on the guardrail; (5) that he just sat in his car watching the two of them (i.e. Davis and Floyd) and that the third time they turned to look at them he "just threw of the gun and pulled the trigger;" (6) that he then jumped out of the car and realized it was not his daughter and son-in-law; (7) that he shot the gun twice; (8) that he tried to grab the female (Floyd) but that she ran - that there was a struggle but she got away.

He claims to have taken his own shirt off and left it at the scene because it was "hot." He denied throwing rocks at Floyd and he denied ever touching Davis after the shooting. JACKSON said that when he left the scene Davis was still breathing. Finally, he told the officers that he had screwed up, was sorry as hell and that he needs to pay for his mistake.

DNA testing was conducted on blood found on Jackson's torn shirt found at the scene with a view toward determining if Davis's DNA was present. There was no DNA that could be attributable to Davis found on Jackson's shirt.

(ECF No. 37.)

On March 23, 2011, after a thorough plea colloquy in which Jackson acknowledged among other things that the statement of facts was accurate, that he was pleading guilty because he was in fact guilty, that his plea agreement called for him to receive a life sentence, and that he was satisfied with the representation and advice he had received from counsel, Jackson pled guilty pursuant to his written plea agreement. The court ordered a presentence report, held a sentencing hearing on June 9, 2011, and sentenced Jackson to life in prison plus 420 months consecutive.

II.

Jackson claims that he had taken "massive amounts of both prescription and non-prescription opiates" and had consumed alcohol and smoked marijuana on the day he killed Davis and wounded Floyd. He claims his counsel rendered ineffective assistance in misadvising

him that his resulting "mental impairment" (his voluntary intoxication) was not a defense to the charges against him. He claims that had counsel properly advised him concerning this "affirmative defense" he would have insisted on going to trial where he likely would have been found guilty of voluntary manslaughter rather than capital murder. The court rejects the claim.

The Insanity Defense Reform Act of 1984 (IDRA), 18 U.S.C. § 17 "narrowed the definition of insanity that had evolved from the caselaw" and "shifted to the defendant the burden of proving the insanity defense by clear and convincing evidence." United States v. Garcia, 94 F.3d 57, 61 (2d Cir. 1996). "Congress, speaking through the Senate Judiciary Committee, stated: 'the committee also intends that, as has been held under present case law interpretation, the voluntary use of alcohol or drugs, even if they rendered the defendant unable to appreciate the nature and quality of his acts, does not constitute insanity or any other species of legally valid affirmative defense.'" Id. (citations omitted). In the words of the Second Circuit—"[s]tatements of congressional intent are rarely so clear." Id. Consequently, in the strictest sense, voluntary intoxication is not a defense or at least is not an affirmative defense. But that is not to say that the IDRA prohibits "psychiatric evidence of a mental condition short of insanity when such evidence is offered purely to rebut the government's evidence of specific intent, although such cases will be rare." United States v. Worrell, 313 F.3d 867, 874 (4th Cir. 2002). But voluntary intoxication it is not admissible for the purpose Jackson suggests here: to reduce his murder to manslaughter.

In those rare instances in which voluntary intoxication is even admissible, it is only admissible for its tendency to negate specific intent. Murder in the second degree requires no showing of specific intent. To prove murder in the second degree the government does not have to show intent to kill or injure. It need only show malice, which "may be established by

evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of or serious bodily harm." United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003) (internal citations and quotations omitted). Consequently, Jackson's claim that his voluntary intoxication would have been admissible to reduce the level of his homicide from murder to manslaughter is a non-starter.

In order to establish a claim of ineffective assistance of counsel, Jackson must show that counsel's performance was deficient and that the deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish deficient performance, he must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. To establish prejudice, he must demonstrate that but for his attorney's errors, there is a reasonable probability that the outcome of the proceeding would have been different. Id. at 694. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Id. In the context of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 58 (1985).

Jackson stipulated to facts strongly suggesting premeditation,[2] entered a guilty plea to avoid a death sentence, and received the benefit of his bargain. He now premises a § 2255 motion on his mistaken belief that his voluntary intoxication would have been admissible for the purpose of reducing the homicide from murder to manslaughter. His premise is not only wrong, but even in the unlikely (but possible) event that a jury were to have found the murder to be

---

[2] Even Jackson's motion to vacate and supporting memorandum recount with some clarity Jackson's alleged reasoning process at the scene of the murder.

second-degree murder rather than first-degree murder, Jackson still would have been subject to a possible death sentence under 18 U.S.C. § 924(j)(1). United States v. Julian, 633 F.3d 1250, 1256 (11th Cir. 2011) (noting that "[t]he main point of section 924(j) is to extend the death penalty to second-degree murders that occur in the course of violations of section 924(c )"). Under the circumstances, the court readily concludes, at the prejudice prong of the effective assistance inquiry, that there is not a reasonable probability that Jackson would have insisted on going to trial rather than pleading guilty in exchange for a life sentence. Consequently, the court rejects Jackson's claim that his counsel rendered ineffective assistance in advising him concerning the viability of a "mental impairment" defense. (Br. in Supp. of Mot. to Vacate 10, ECF No. 55.)

## III.

Congress has provided that a defendant in a capital case is entitled upon request to the appointment of two counsel, at least one of whom "shall be learned in the law applicable to capital cases." See 18 U.S.C. § 3005. Jackson complains that he had little or no contact with one of his two court-appointed attorneys in violation of his right to effective assistance. The claim has no merit. As "the right to two counsel granted by § 3005 is purely statutory," United States v. Williams, 544 F.2d 1215, 1218 (4th Cir. 1976), it provides no litmus test or standard for an effective assistance claim. Rather, effective assistance claims are governed exclusively by Strickland's two-part Sixth Amendment analysis which Jackson has failed to satisfy. Accordingly, the court denies the claim.

## IV.

Jackson murdered Timothy Phillip Davis and seriously wounded Christina Shay Floyd. He pled guilty to avoid a possible death sentence and received the benefit of his bargain. He has

based a § 2255 motion on two frivolous assumptions: (1) that his voluntary intoxication would have been admissible for the purpose of reducing the murder to manslaughter; and (2) that § 3005 alters <u>Strickland's</u> two-part Sixth Amendment analysis governing effective assistance claims. But irrespective of Jackson's assumptions, there is not a reasonable probability that but for counsel's alleged unprofessional errors the outcome of the proceedings would have been different. Consequently, the court denies *sua sponte* Jackson's § 2255 motion attacking his plea and sentence.

**Enter**: March 1, 2012.

_____
UNITED STATES DISTRICT JUDGE